NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 48

No. 24-AP-298

| | |
|---|---|
| In re Appeal of S.C.-M. | Supreme Court |
| | On Appeal from<br>Human Services Board |
| | May Term, 2025 |

Michael J. Donohue, Chairperson

Matthew Valerio, Defender General, and Kerrie Johnson, Appellate Defender, Montpelier, for
  Appellant.

Charity R. Clark, Attorney General, and Zachary D. Martin and Julianne Woolard, Assistant
  Attorneys General, Montpelier, for Appellee.


PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1.    **COHEN, J.**    Petitioner S.C.-M. appeals the Human Services Board's decision affirming his substantiation by the Department for Children and Families (DCF) for placing a child, L.M., at risk of sexual harm. Petitioner argues DCF failed to prove by a preponderance of the evidence that petitioner placed L.M. at risk of sexual harm and that the Board improperly added findings that were both outside the record and unsupported by the evidence to reach its conclusion. Petitioner also asserts DCF abused its discretion by declining to consider the individual facts and circumstances of the case when it accepted the report as an investigation rather than an assessment based solely on petitioner's age. We affirm.

## I. Legal Framework

¶ 2.    Chapter 49, subchapter 2 of Title 33 sets forth the process for reporting and responding to incidents of child abuse and neglect. Under § 4915, DCF must promptly assess a

report and, "[i]f the report is accepted as a valid allegation of abuse or neglect," DCF must conduct either an assessment or investigation. An investigation must be conducted "when an accepted report involves allegations indicating substantial child endangerment," which includes "conduct by an adult involving or resulting in sexual abuse." 33 V.S.A. § 4915(a)-(b), (d). The statute provides, however, that DCF "may conduct an investigation of any report." Id. § 4915(d). If DCF determines through investigation that a report "is based upon accurate and reliable information that would lead a reasonable person to believe that [a] child has been abused or neglected," the report is considered "[s]ubstantiated." Id. § 4912(16).[1] DCF maintains a "Child Protection Registry that . . . contain[s] a record of all investigations that have resulted in a substantiated report." Id. § 4916(a)(1).

¶ 3. Following the initial determination that a report of abuse or neglect is substantiated, DCF must send notice to the person alleged to have committed the abuse or neglect of "the right to request a review of the substantiation determination by an administrative reviewer." Id. § 4916a(a)(4). If the person requests review, DCF is required to hold an administrative-review conference at which the substantiated person may present evidence or other information supporting their position. Id. § 4916a(e). If the reviewer upholds the substantiation determination, the person has the right to appeal to the Board. Id. § 4916a(i). The Board is required to hold a hearing at which the petitioner and DCF may present evidence and DCF must prove the facts alleged by a preponderance of the evidence. 3 V.S.A. § 3091; Fair Hearing Rules § 1000.3(O), Code of Vt. Rules 13 020 002 [hereinafter Fair Hearing Rules], http://www.lexisnexis.com/hottopics/codeofvtrules; see In re R.H., 2010 VT 95, ¶ 17, 189 Vt. 15, 14 A.3d 267. The Board or the hearing officer then issues written findings of fact, and "[i]f the hearing is conducted by a hearing officer,

---

[1] At the time of the investigation, substantiation was based on a reasonable-person standard. As of September 2024, the statute requires proof by a preponderance of the evidence. 2023, No. 154 (Adj. Sess.), § 3. All statutes cited herein refer to the statutes in operation at the time of the investigation.

the hearing officer's findings shall be reported to the Board, and the Board shall approve the findings and adopt them as the findings of the Board unless good cause is shown for disapproving them." 3 V.S.A. § 3091(c).

¶ 4.  If the hearing officer provides recommendations, the Board may "adopt the recommendation of the hearing officer, or reject it and reach different conclusions on the basis of the evidence at hand, or refer the matter back to the hearing officer for a continuation of the hearing or for the receipt of additional evidence" upon considering all of the facts and arguments by the parties.  Fair Hearing Rules § 1000.4(F).  The Board may affirm, modify, or reverse DCF decisions, and both parties may appeal this decision to the Supreme Court.  3 V.S.A. § 3091(d), (f).

## II.  Factual and Procedural Background

¶ 5.  In October 2020, DCF substantiated petitioner for risk of sexual harm to a child. Petitioner requested a review, and in June 2022, the Commissioner's Registry Review Unit upheld the substantiation.  Petitioner appealed to the Board.  A hearing officer appointed by the Board conducted a hearing in March 2024 and issued her proposed findings of fact and recommendation in July 2024.  The hearing officer recommended that the substantiation be reversed.

¶ 6.  In September 2024, the Board issued its decision, which adopted the following findings of fact from the hearing officer pursuant to 3 V.S.A. § 3091(c) but affirmed the substantiation.  In 2006, petitioner was substantiated for sexually abusing a minor based on a report that he touched the breasts and buttocks of a twelve-year-old girl over her clothing.  Petitioner was twenty years old at the time and was reportedly "developmentally delayed."  Petitioner has a learning disability, difficulty comprehending legal matters, anxiety when speaking with authority figures, post-traumatic stress disorder, and depression.  He functions between the upper end of the intellectually deficient range and the low end of the borderline range of intelligence with a low average processing speed.

¶ 7.  In 2011, petitioner married his husband, with whom he currently lives.

¶ 8.     In 2019, petitioner pled guilty to open and gross lewdness involving an eighteen-year-old male college student, as well as providing false information to law enforcement. Petitioner was put on probation and was required to adhere to sex-offender special conditions of probation.  Petitioner was required to participate in and complete a treatment program for sex offenders.   As of July 2020, petitioner completed the intake but had not begun sessions. Petitioner's conditions also provided that petitioner "may not initiate or maintain contact with females . . . under the age of 16 unless otherwise approved in advance and in writing by [the] Probation Officer."   The condition further provided that "[s]aid contact may require being accompanied by a responsible adult, approved by [the] Probation Officer or designee[;] unless otherwise supervised by a third party adult guardian or parent."

¶ 9.     Petitioner has met with the same probation officer since 2019, except for a one-year period around 2022 when petitioner met with a different officer.  The probation officer initially allowed petitioner to have contact with the four minor female and male children of a friend with either the children's parents or petitioner's husband present.  The probation officer subsequently retracted this approval when he learned that petitioner's husband was substantiated in 2000.[2]

¶ 10.    Around ten years ago, petitioner and his husband became acquainted with L.M.'s mother.   In early 2020, L.M.'s mother posted on Facebook seeking a babysitter for L.M. Petitioner's husband saw this post and offered to help.  Petitioner's husband began to babysit L.M. in petitioner's presence at their apartment and petitioner would accompany his husband and L.M. on outings.  Petitioner did not tell his probation officer about his husband babysitting L.M.

¶ 11.    In 2020, L.M. was eight years old, identified as a transgender boy, went by a traditionally male name, wore stereotypical boy clothing, and had cropped hair.  L.M.'s mother knew petitioner would be around L.M., that petitioner was on probation for a sex offense, and that

---

[2]   Petitioner's husband was only twelve years old at the time and DCF no longer substantiates children in most cases.  DCF did not substantiate petitioner's husband in this matter, concluding that he posed no risk because he was a minor at the time of his substantiation in 2000.

4

he had been substantiated in 2006. She did not know the 2019 offense involved a male college student. L.M.'s mother was not concerned about L.M. being around petitioner.

¶ 12. Petitioner and his husband watched L.M. a couple days a week as needed and more frequently in the summer. At times L.M. slept over at their 700-square-foot apartment. During this time, petitioner's friend lived with petitioner and his husband in their apartment and slept on the sectional couch. Petitioner's friend knew that petitioner was on probation.

¶ 13. When L.M. spent the night, he would either sleep on the couch near petitioner's friend, or on the floor in the bedroom doorway. Petitioner's husband would sometimes move L.M. from the floor to the couch. Petitioner's bed is located against the wall in the bedroom and petitioner sleeps on the side next to the wall while his husband sleeps on the side closest to the bedroom door. The bathroom door is accessible through the bedroom.

¶ 14. From the couch, petitioner's friend could see L.M. when he was on the couch or the floor and could see into petitioner's bedroom when the door was open. L.M. never got into bed with petitioner and his husband. When L.M. slept on the couch, the bedroom door would be closed. Petitioner's friend could hear when L.M. would get up in the night, usually to use the bathroom, and petitioner's friend would let L.M. use her phone as a flashlight. When L.M. needed to shower, petitioner's husband would set out clean clothes and towels for L.M., start the shower, and then shut the bathroom door in order for L.M. to shower by himself. L.M. would then get dressed on his own and petitioner's husband would clean up the bathroom afterward.

¶ 15. When petitioner's husband and petitioner took L.M. on an outing, petitioner's friend would often accompany them. Petitioner's husband or friend was always with L.M. and petitioner was never alone with L.M.

¶ 16. Prior to this babysitting arrangement, L.M. experienced mental health and behavioral problems. However, L.M. did not have these issues with petitioner's husband and

5

petitioner; they all enjoyed spending time together and L.M. looked up to petitioner and his husband, who were like family to him.

¶ 17.   In July 2020, DCF received a report that petitioner and his husband posed a risk of sexual harm to L.M.  DCF opened an investigation and the investigator first interviewed L.M. and his mother.  L.M. stated that he enjoyed spending time with petitioner and his husband, he was sad he would no longer be watched by them, petitioner and his husband were supportive of his gender identity, and petitioner would sleep on the bedroom floor sometimes because he felt scared at night.  L.M. also stated that petitioner's friend stayed at the apartment and slept on the couch.  L.M. reported one instance where he heard petitioner and his husband whispering and heard the bed move and thought petitioner and his husband may be having sex.  The investigator then told L.M.'s mother that petitioner and his husband should not watch L.M.

¶ 18.   In August 2020, the investigator interviewed petitioner over the phone with petitioner's husband and friend present.[3]  Petitioner told the investigator that he would stay in his friend's car or at a neighbor's house when L.M would stay the night and that he did not know L.M. was born female.  Petitioner told the investigator that he had not told his probation officer about the babysitting because they "did not see eye to eye."  Petitioner's friend identified herself and stated she could verify that L.M. would sleep on the couch because she was also sleeping on the couch.  Petitioner and his husband refused to speak further without an attorney.

¶ 19.   Petitioner had a legal guardian at the time who communicated to the investigator that petitioner needed assistance.[4]  The investigator attempted to accommodate petitioner by asking petitioner if he wanted to meet with his guardian, probation officer, or an attorney.  Petitioner's

---

[3]   Petitioner's friend testified she was not present during this call, but the Board credited the investigator's testimony over the friend's testimony.

[4]   Petitioner's friend was formally appointed as petitioner's guardian by the probate court in February 2023.  It is not clear from the record whether petitioner's friend was also his guardian at the time in 2020.

attorney subsequently contacted the investigator to set up an interview, but shortly before the meeting the attorney canceled the meeting on petitioner's request.

¶ 20.    In October 2020, the investigator completed the investigation and substantiated petitioner for risk of sexual harm to L.M.  The investigator based this decision on interviews with L.M., his mother, the probation officer, petitioner, petitioner's husband, and petitioner's friend, as well as petitioner's 2006 substantiation, petitioner's criminal history, and guidance from the investigator's supervisor.

¶ 21.    The Board found that despite petitioner's cognitive limitations and anxiety, petitioner understood that he was prohibited from having unsupervised contact with females under the age of sixteen.  The Board found petitioner's statements to the investigator that he did not know L.M. was biologically female conflicted with L.M.'s mother's testimony and were not credible. His statements that he would sleep elsewhere when L.M. stayed the night were similarly not credible because they were contradicted by his husband's testimony.  The Board ultimately found that petitioner had "regular and ongoing access" to L.M. including on occasional nights.  The Board reasoned that although petitioner was never alone with L.M., this was not equivalent to constant supervision because L.M. went on numerous outings with petitioner present, and spent occasional nights in petitioner's home while his husband and friend were sleeping, including on their bedroom floor, and no adult approved by the probation officer was present to supervise.

¶ 22.    The Board found that petitioner's lies to the investigator also demonstrated nonaccidental conduct.  It concluded that DCF established by a preponderance of the evidence that petitioner posed a risk of harm to L.M. under 33 V.S.A. § 4912(14).  Petitioner appealed.

III.  Analysis

¶ 23.    We review the Board's decision regarding substantiation for an abuse of discretion. In re R.H., 2010 VT 95, ¶ 21.  We are limited to deciding whether the Board "applied the proper legal standard, whether the evidence before the Board reasonably supports its findings, and

7

whether the Board's findings reasonably support its conclusions." In re M.V., 2022 VT 31, ¶ 11, 216 Vt. 491, 282 A.3d 941 (quotation omitted).

¶ 24. Petitioner first argues that DCF failed to prove that petitioner resided with L.M. or was unsupervised with L.M., and therefore failed to prove by a preponderance of the evidence that he placed L.M. at risk of sexual abuse. An "abused or neglected" child is a child who is at "substantial risk of harm by the acts or omissions of . . . [a] person responsible for the child's welfare" and can also include a child who is at "substantial risk of sexual abuse by any person." 33 V.S.A. § 4912(1). As relevant to this appeal, "risk of harm" is defined as "a significant danger that a child will suffer serious harm . . . which harm would be likely to cause . . . sexual abuse, including as the result of . . . a registered sex offender or person substantiated for sexually abusing a child residing with or spending unsupervised time with a child." Id. § 4912(14)(F).

¶ 25. The Board found that L.M. spent the night on several occasions at petitioner's apartment with petitioner present. Petitioner does not challenge this finding. Though the Board found petitioner was never alone in the home with L.M., it reasonably inferred from the circumstances that petitioner had opportunities to access L.M. while petitioner's husband and friend were asleep. In turn, petitioner's access to L.M. coupled with the evidence of petitioner's prior record, his disingenuous statements to the investigator that he slept elsewhere when L.M. was over and didn't know L.M. was born female, and his deliberate failure to report about the babysitting arrangement to his probation officer, supported the Board's conclusion that petitioner posed a risk of harm to L.M.

¶ 26. Petitioner argues the term "unsupervised" in 33 V.S.A. § 4912(14) should be defined to mean being around a child without the presence of another adult, even if that adult is sleeping. We, and the Board, must defer to DCF's interpretation of the statutes governing child-abuse substantiation. In re M.V., 2022 VT 31, ¶ 22. DCF has evidently adopted a broader interpretation of the term "unsupervised" in considering risk of harm. Viewed as a whole, the

statute appears to support this broader view, as it defines risk of sexual harm to include a "person substantiated for sexually abusing a child <u>residing with</u> a child or spending unsupervised time with a child." 33 V.S.A. § 4912(14)(F) (emphasis added). The term "residing with" is not limited to substantiated persons who live alone with a child. The statute therefore plainly contemplates that the presence of other adults does not prevent a determination of risk of sexual harm.

¶ 27. Petitioner argues the Board's decision was arbitrary because the Board reached the opposite conclusion in a 2024 substantiation appeal with "nearly identical facts." In that case, the petitioner was convicted of possession and distribution of child pornography and substantiated for this conduct. Fair Hearing No. B-06/23-418, at 2 (Hum. Servs. Bd. Sept. 6, 2024), https://outside.vermont.gov/agency/AHSHSB/Orders/Documents/2024/FH-B-06-23-418%20 Order.pdf [https://perma.cc/68PF-5D8M]. The petitioner had probation conditions that restricted his contact with minors. He was substantiated by DCF for knowingly spending unsupervised time with his fiancée's two minor children during two overnight stays, during which his fiancée was allegedly inebriated. Id. at 4. The Board reversed the petitioner's substantiation because DCF failed to consider the factors described in DCF's policy for substantiation, the petitioner was determined to be a low-risk offender, the petitioner's fiancée provided credible evidence of her commitment to the children's protection, the petitioner had engaged in sex-offender treatment, the petitioner was found to be credible in his testimony, and there was insufficient evidence that the fiancée was so incapacitated that she was unable to provide supervision. Id. at 23-24.

¶ 28. The Board's decision in Fair Hearing No. B-06/23-418 is not inconsistent with its decision in the present matter. Several facts distinguish the two cases: (1) the petitioner in that case had started sex-offender treatment and petitioner here had not; (2) the petitioner in that case was determined to be a low-risk offender after completion of a risk assessment, whereas petitioner here had not been assessed; (3) the petitioner in that case only spent two nights with the children and petitioner here was present for babysitting during the school year and summer, and L.M.

9

occasionally spent nights at petitioner's apartment; and (4) the petitioner in that case did not conceal his conduct, unlike petitioner here, who did not inform his probation officer and lied to the DCF investigator. Id. at 22-25. In Fair Hearing No. B-06/23-418, the Board found that DCF did not consider these factors when substantiating the petitioner and failed to prove there was any actual risk due to lack of supervision. Id. at 22-23. In contrast, here DCF presented evidence of petitioner's lack of credibility, petitioner's prior record and lack of sex-offender treatment, and that petitioner had repeated opportunities to access L.M. for the Board to consider in making its decision. The two cases are therefore not so similar that it was arbitrary for the Board to reach different conclusions in each.

¶ 29. Petitioner next argues that, as part of the "risk of harm" analysis, DCF was required to prove that the 2006 substantiation was valid by a preponderance of the evidence and failed to do so. Petitioner asserts DCF substantiated petitioner in 2006 based on the "constitutionally deficient" reasonable-person standard and therefore the underlying conduct needed to be proven by a preponderance of the evidence to avoid denying petitioner due process of law because his protected liberty interest was at risk. Petitioner further argues that the hearing officer unfairly denied his request for discovery to obtain the investigation files for the 2006 substantiation.

¶ 30. The Board was required to evaluate whether DCF established by a preponderance of the evidence that petitioner posed a risk of sexual harm to L.M. See Fair Hearing Rules § 1000.3(O). DCF alleged that petitioner posed such a risk because he had been substantiated for sexually abusing a child and was spending unsupervised time with L.M. See 33 V.S.A. § 4912(14)(F) (defining "risk of harm" as a "significant danger that a child will suffer serious harm by other than accidental means, which harm would be likely to cause . . . sexual abuse, including as the result of . . . a registered sex offender or person substantiated for sexually abusing a child residing with or spending unsupervised time with a child").

10

¶ 31. Contrary to petitioner's argument, DCF did not need to prove the facts underlying the 2006 substantiation to support the current substantiation. The statute only required DCF to show that petitioner had been previously substantiated, and not whether the underlying facts of the prior substantiation were established by the current burden of proof. Id.; In re M.V., 2022 VT 31, ¶¶ 15, 18 (holding we look to plain language of statutes and "we do not read words into a statute that are not there"). It was undisputed that petitioner was substantiated in 2006. This ends the inquiry.

¶ 32. Petitioner is essentially requesting a second look at the allegations in his 2006 substantiation under a standard not in place at the time. See 2023, No. 154 (Adj. Sess.), § 3 (amending 33 V.S.A. § 4912(16) in September 2024 to require DCF prove elements by preponderance of evidence in order to substantiate). Petitioner had the opportunity to request review of the 2006 substantiation but did not do so, making it final. 33 V.S.A. § 4916b(d). He cannot challenge that substantiation in this proceeding. See Town of Pawlet v. Banyai, 2024 VT 13, ¶ 11, 219 Vt. 90, 315 A.3d 1008 ("When a party's arguments are an impermissible collateral attack, they are barred." (quotation omitted)). Because the validity of the 2006 substantiation was not at issue in this proceeding, petitioner has also failed to demonstrate that the hearing officer committed reversible error in denying his request for discovery of the investigation files for the 2006 substantiation.

¶ 33. Petitioner asserts he should be able to challenge the validity of the 2006 substantiation because has a protected liberty interest in avoiding erroneous placement on the child protection registry and a right to a fair hearing. We agree with petitioner that the interest in avoiding erroneous placement on the child protection registry is substantial because it negatively impacts employment opportunities and petitioner's reputation. See Lowell v. Dep't for Child. and Fams., 2024 VT 46, ¶ 32, __ Vt. __, 325 A.3d 42. However, petitioner's interest in avoiding potentially erroneous placement on the child protection registry is protected by the extensive

11

review process afforded by statute. See id. ¶¶ 34-37. It does not give him the right to reopen a final decision from nearly two decades ago. Accepting petitioner's argument would potentially require DCF to relitigate all substantiations finalized prior to September 2024 in future substantiation proceedings. Notably, when the Legislature amended the substantiation burden of proof, it did not state the burden should be applied retroactively. Petitioner's argument would effectively contravene the Legislature's intent through collateral attacks during later substantiation proceedings. See A.B. v. S.U., 2023 VT 32, ¶ 21, 218 Vt. 123, 298 A.3d 573 (holding "any retroactive application must be explicit" due to "general prohibition against retroactive construction of statutes in 1 V.S.A. § 214").

¶ 34. In the alternative, petitioner argues there is an insufficient connection between the 2006 substantiation and the alleged threat petitioner posed to L.M. because the 2006 incident occurred fourteen years prior to the 2020 report, when he was much younger, and involved a girl. When a person under investigation by DCF has been previously substantiated, DCF policy directs investigators to collect the following information about the prior substantiation: (1) the date of the offense and the amount of time that has passed since the offense; (2) the offender's age at the time of the prior offense; (3) the victim's age, gender, and relationship to the offender; (4) the offense behavior, severity, frequency, and duration; and (5) whether any treatment was completed. Department for Children and Families Family Services Policy Manual, Risk of Harm/Sexual Abuse Investigations No. 57, at 3 [hereinafter DCF Policy No. 57], https://dcf.vermont.gov/fsd/laws-rules/policies [https://perma.cc/BH7L-V64D]. Investigators are also instructed to consider the history of sexual abuse or offenses perpetrated by the offender when deciding to substantiate. DCF Policy No. 57, at 6.

¶ 35. Here, DCF collected evidence that fourteen years earlier, in 2006, petitioner was substantiated for touching the breasts and buttocks of a twelve-year-old girl over her clothing. He was twenty years old at the time. The incident occurred in the basement of another person's house

with several other people present but no parent, guardian, or caregiver. There is no indication that petitioner completed any treatment for the 2006 substantiation. DCF considered these factors in its justification for substantiation. The Board evidently concluded that the circumstances of the 2006 substantiation, specifically the victim's age and gender and petitioner's behavior, were sufficiently similar to be relevant to the current case. It was reasonable for the Board to weigh these factors over the length of time since the 2006 substantiation, particularly because L.M. and the 2006 victim were of similar ages and petitioner attempted to conceal that he knew L.M. was born female. See In re T.C., 2007 VT 115, ¶ 26, 182 Vt. 467, 940 A.2d 706 ("The factfinder is best situated to weigh evidence.").

¶ 36. Petitioner next argues the Board speculated as to the contact between petitioner and L.M. and made findings outside of the record. Specifically, petitioner argues the Board impermissibly speculated in paragraph 39 of its decision that petitioner could have had unsupervised contact with L.M. despite finding petitioner was never alone with L.M. and testimony from petitioner's husband and friend that both would wake up if either petitioner or L.M. moved.

¶ 37. The Board adopted the hearing officer's findings, which it was required to do absent good cause. 3 V.S.A. § 3091(c). However, the Board was not required to adopt the recommendation of the hearing officer as to the ultimate legal issue. Fair Hearing Rules § 1000.4(F). The Board's statements in paragraph 39 reflect the beginning of the Board's own analysis and the inferences it drew from the facts. Its statement that petitioner "had regular and ongoing access to [L.M.], including on occasional nights" was a reasonable inference based on the amount of time L.M. spent with petitioner and his husband, including overnights. The Board did not make findings outside the record.

¶ 38. We are unpersuaded by petitioner's claim that the Board's statements in paragraph 39 deprived petitioner of due process because petitioner was unaware the Board would

13

form its own opinion and therefore was unprepared to respond to the Board's conclusion about the potential for unsupervised contact. The record below, including the transcripts of the hearings and petitioner's own filings, shows that petitioner was on notice that his substantiation was premised on the fact that he was allegedly spending unsupervised time with L.M. He therefore had the opportunity to prepare for arguments and evidence that petitioner was unsupervised or residing with L.M. Again, that the Board weighed the evidence differently than how petitioner wished is not an abuse of discretion. See In re T.C., 2007 VT 115, ¶ 26.

¶ 39. Petitioner also argues the Board abused its discretion by relying on the 2019 conviction because it involved an adult, and the statute requires proof that the person being substantiated is a registered sex offender or was previously substantiated for abusing a child. However, the Board and DCF did not rely on the 2019 offense to satisfy this element of the statutory definition of risk of harm. Rather, they considered it as an additional factor alongside the 2006 substantiation, petitioner's failure to engage in sex-offender treatment, and petitioner's dishonest responses during the investigation and failure to notify his probation officer that he was caring for L.M. We see no error in the Board's consideration of evidence of petitioner's 2019 conviction for a sex-related offense. DCF Policy No. 57 states investigators should "begin their investigation by gathering and reviewing as much background information as possible" which may include, but is not limited to, Department of Corrections (DOC) records. DCF Policy No. 57, at 1.

¶ 40. DCF Policy No. 57 further states if an offender is under DOC supervision, investigators should contact DOC to determine the offender's compliance with supervision and treatment, among other factors. Id. at 3-4. DCF has the authority to issue rules "outlining procedures for investigations." 33 V.S.A. § 4922(a)(3). Therefore, DCF had the authority to include DOC records in its investigation to evaluate whether petitioner put L.M. at risk of sexual abuse. Petitioner's 2019 offense and subsequent supervision by a probation officer was relevant to the investigation as it involved sexual misconduct. See DCF Policy No. 57, at 6.

14

¶ 41. Finally, petitioner argues DCF abused its discretion by declining to consider the individual facts and circumstances and instead mandating an investigation based solely on petitioner's age. Petitioner argues DCF's policies contravene the Legislature's intent to create "a range of responses to child abuse and neglect" that balance "the need to protect children and the potential employment consequences of a registry record for persons who are substantiated" by mandating investigation in circumstances not explicitly prescribed by the statute. See 33 V.S.A. § 4911(4), (5).

¶ 42. The statute states DCF "shall conduct an investigation when an accepted report involves allegations indicating substantial child endangerment." Id. § 4915(d). " 'Substantial child endangerment' includes conduct by an adult involving or resulting in sexual abuse." Id. DCF's policy for screening reports of child abuse and neglect further clarifies the term "substantial child endangerment" and what potentially constitutes "involving or resulting in sexual abuse." See Department for Children and Families Family Services Policy Manual, Child Safety Interventions No. 51, at 16 [hereinafter DCF Policy No. 51], https://dcf.vermont.gov/fsd/laws-rules/policies [https://perma.cc/GL6W-G5R2].[5] The policy states DCF shall investigate a report "if [the report] alleges substantial child endangerment, including but not limited to allegations that . . . [a] child is at risk of harm for sexual abuse by any adult" and other possible scenarios. Id. Petitioner argues that by mandating investigations into allegations that a child is at risk of harm for sexual abuse by any adult, DCF is acting contrary to the statute, which only requires investigations when there is conduct by an adult involving or resulting in sexual abuse.

¶ 43. We disagree with petitioner. The plain language of the statute provides a nonexhaustive list of conduct considered to result in substantial child endangerment. This includes, but is not limited to, conduct by an adult involving or resulting in sexual abuse. 33

_____

[5] The same language appeared in the version of DCF Policy No. 51 that was in effect at the time of the substantiation.

V.S.A. § 4915(d); see In re Windham Windsor Hous. Tr. JO Appeal, 2024 VT 73, ¶ 5, __ Vt. __, 328 A.3d 1225 ("When interpreting a statute, our primary goal is to give effect to the legislative intent and to do so we first look to the plain meaning of the statute." (quotations omitted)). Moreover, the statute expressly provides that DCF "may conduct an investigation of any report." 33 V.S.A. § 4915(d). The Legislature also granted DCF the authority to promulgate "rules setting forth criteria for determining whether to conduct an assessment or an investigation." Id. § 4922(a)(1).

¶ 44. DCF exercised this authority in DCF Policy No. 51. The policy defines allegations that require an investigation because DCF considers them to constitute "substantial child endangerment," including and in addition to what was explicitly defined in the statute. DCF Policy No. 51, at 16. As we stated previously, we defer to DCF's interpretation of the statute it is charged with executing. In re M.V., 2022 VT 31, ¶ 22. Requiring investigation of allegations of "risk of harm" is reasonable, because the term "endangerment" includes risk and not just actual harm. See Endangerment, Black's Law Dictionary (12th ed. 2024) ("The act or an instance of putting someone or something in danger; exposure to peril or harm."). DCF's policy is an authorized elaboration on terms that were not specifically defined or limited in the statute.

¶ 45. Petitioner argues DCF is required to consider the three factors in 33 V.S.A. § 4915(c) when determining whether to conduct an assessment or investigation, and automatically requiring an investigation into allegations of risk of sexual abuse by an adult contravenes the statute. However, § 4915(c) merely states "[t]he decision to conduct an assessment shall include consideration of the following factors." (Emphasis added.) Section 4915(c) does not involve investigations and did not require DCF to evaluate petitioner under those factors when it determined that the report against him involved allegations that qualified as substantial child endangerment.

¶ 46. Petitioner faults DCF for not conducting an individualized assessment of his case. However, DCF considered the factors set forth in DCF Policy No. 57, which are similar but not identical to the assessment factors in § 4915(c), when deciding whether to substantiate him.[6] DCF Policy No. 57, at 6. DCF decided to substantiate petitioner because petitioner was substantiated in 2006 for sexual abuse of a minor, petitioner had a 2019 offense of sexual misconduct with an adult, petitioner had ongoing access to L.M., petitioner had not completed sex-offender treatment, and petitioner was not credible in his responses to the investigator and concealed his access to and association with L.M. The Board did not abuse its discretion in affirming petitioner's substantiation based on these facts.

Affirmed.

FOR THE COURT:

_____

Associate Justice

---

[6] DCF Policy No. 57 states the following criteria are to be taken into account when deciding to substantiate: "[t]he history of sexual abuse or offenses[,] [t]he nature of the abuse or offense[,] and] [t]he history of treatment." DCF Policy No. 57, at 6.